IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

CLARENCE FRANKLIN                                    PLAINTIFF

V.
                        NO. 11-6011

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Clarence Franklin, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for a period of disability and disability insurance benefits

(DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI

of the Social Security Act (Act).  In this judicial review, the Court must determine whether there

is substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. § 405(g).

I.        **Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on January 31, 2007,

alleging an inability to work since June 2, 2001, due to "Heart - recurring problems; Lungs -

recurring problems; Hypertension; wired chest bones."  (Tr. 101-102, 106).  An administrative

hearing was held on March 17, 2009, at which Plaintiff appeared with counsel and testified.  (Tr.

-1-

20-46).

By written decision dated June 22, 2009, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe - hypertension, effects of past chest wound, and borderline intellectual functioning. (Tr. 13). However, after reviewing all of the evidence presented, he determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 13). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except can only walk two to three blocks, stand for 20 to 25 minutes at a time, and sit for two hours continuously. Non-exertionally is limited to unskilled work where interpersonal contact is incidental to the work performed, tasks can be no more complex than those learned and performed by rote, with few variables, little judgment required and supervision is simple, direct, and concrete.

(Tr. 15). The ALJ found that Plaintiff was unable to perform his past relevant work as an auto parts clerk, dishwasher, construction laborer and maintenance worker, and with the help of a vocational expert (VE), determined Plaintiff could perform other work as a factory assembler or factory inspector. (Tr. 17, 18).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on December 8, 2010. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 5). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 10, 11, 12).

**II.    Evidence Presented:**

Plaintiff was born in 1962 and completed the 11th grade in school. (Tr. 101, 240).

-2-

According to Plaintiff, in 1982, he was stabbed with a knife in his chest, and surgery was required to repair his heart and lungs and to wire his chest bones. (Tr. 106). The earliest medical record contained in the transcript is dated October 6, 2001, when Plaintiff presented himself to National Park Medical Center Emergency Room, complaining of headaches and increased blood pressure. (Tr. 227-228). It was reported that Plaintiff used to be on blood pressure medication. (Tr. 227). Plaintiff was diagnosed with hypertension and headache. (Tr. 229).

It was not until March 15, 2004, that Plaintiff returned to National Park Medical Center, complaining of chest pain. (Tr. 187-188). The final diagnosis was hypertension and chest pain. On March 15, 2004, when Dr. John O. Brandt saw Plaintiff, Dr. Brandt noted that Plaintiff did not take his blood pressure medications and reported that he was a smoker, and had been most of his adult life. (Tr. 172). The report also notes that Plaintiff "does drink a fair amount of beer." (Tr. 172). Plaintiff was assessed by Dr. Brandt with "Chest pain, rule out myocardial infarction. Rule out coronary artery disease." (Tr. 172).

A cardiology consultation was conducted on March 15, 2004, by Dr. Michael Frais. (Tr. 176-178, 191-193). Dr. Frais reported that Plaintiff was a poor historian, and described chest pressure coming on with such activities as performing a brake job on a car, and stating that the pain lasted for several hours. (Tr. 176). Dr. Frais reported that Plaintiff smoked less than a pack of cigarettes a day and drank alcohol socially. (Tr. 176). Dr. Frais also noted that Plaintiff did not take any medications "apart from garlic." (Tr. 176). Dr. Frais' impression was:

1. Atypical chest pain. Possible acute coronary syndrome
2. Hypertension. Noncompliance with medications
3. Stab wound to chest ten to eleven years ago with subsequent atypical chest pains.

(Tr. 177).   Dr. Frais reported that Plaintiff required further investigation of his chest pain,

-3-

ideally with coronary angiography, but that Plaintiff was unwilling to proceed with this. Therefore, Dr. Frais reported that Plaintiff would require a non-evasive stress test. (Tr. 178). Chest x-rays taken on March 15, 2004, revealed no acute findings, with borderline heart size seen. (Tr. 182, 194). On March 17, 2004, Plaintiff underwent a treadmill stress test, and the impression from the test was:

1. Good exercise tolerance
2. Appropriate heart rate response with hypertension
3. No significant chest pain. Ill-defined epigastric discomfort at peak treadmill exercise
4. No clinically significant stress-induced ECG changes

(Tr. 179). Echocardiographic measurements revealed: 1) normal left ventricular size and systolic function; 2) concentric left ventricular hypertrophy;[1] 3) trace of mitral regurgitation with normal left atrium; and 4) trace of tricuspid regurgitation with normal right ventricle and right atrium. (Tr. 181).

On September 16, 2004, Plaintiff again presented himself to National Park Medical Center, complaining of chest pain with shortness of breath, complaining that the pain radiated into his left shoulder/left arm. (Tr. 217). It was again noted that Plaintiff smoked ½ pack of cigarettes per day. (Tr. 217). The primary diagnosis was chest pain/rule out angina, and the secondary diagnosis was HTN (hypertension). (Tr. 221). A chest x-ray revealed no acute cardiopulmonary disease. (Tr. 225).

A year later, on September 4, 2005, Plaintiff presented himself to the National Park Medical Center, complaining of left arm pain secondary to being "stabbed" on August 26, 2005. (Tr. 209). It was noted that Plaintiff smelled of alcohol, and the primary diagnosis was contusion

---

[1]Hypertrophy - The enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells. Dorland's Illustrated Medical Dictionary 910 (31st ed. 2007).

of the scalp and the secondary diagnosis was stab wounds to the left forearm. (Tr. 209-214).

On April 11, 2007, an Intellectual Assessment was performed by Charles M. Spellmann, Ph.D. (Tr. 240-242). Plaintiff reported to Dr. Spellmann that he worked most recently at Auto Zone in 2001, and lost his job because of his high blood pressure. However, he also reported that he had chest pains and that they cut his hours back and eventually "it wasn't worth going in." (Tr. 240). Dr. Spellmann reported that Plaintiff was not taking any medication. (Tr. 240). Plaintiff's verbal IQ was 76, his performance IQ was 80, and his full scale IQ was 76. (Tr. 241). Plaintiff's test results indicated that he was functioning within the borderline range of intelligence. (Tr. 241). Dr. Spellmann noted that Plaintiff did his own housework, prepared his own meals, shopped for himself, and managed his own money. (Tr. 241). Plaintiff reported that he no longer drove because he had vision problems. Dr. Spellmann reported that Plaintiff displayed good ability to concentrate and persist on task, did not give up easily, related in a socially adequate manner, was friendly and smiled easily, communicated in an intelligible and effective manner, and had the mental capacity to deal with basic work-like tasks. (Tr. 241). He also concluded that Plaintiff did not qualify for a diagnosis of mental retardation, and was able to manage funds without assistance.

On April 23, 2007, a Psychiatric Review Technique form was completed by non-examining consultant, Brad F. Williams. (Tr. 243-256). Dr. Williams concluded that Plaintiff had a mild degree of limitation in restriction of activities of daily living; a moderate degree of limitation in difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (Tr. 253). Dr. Williams noted that Plaintiff had no current and ongoing mental health

AO72A
(Rev. 8/82)

treatment, did not take any psychiatric medications, and should be capable of performing unskilled work at that time and at his date last insured, which was December 31, 2004. (Tr. 255). In a Mental RFC Assessment also completed by Dr. Williams on April 23, 2007, he found that Plaintiff was not significantly limited in 13 out of 20 categories, and was moderately limited in 7 out of 20 categories. (Tr. 257-58). Dr. Williams concluded that Plaintiff could perform unskilled work - that he was able to perform work where interpersonal contact was incidental to work performed, e.g. assembly work; where the complexity of the task was learned and performed by rote, with few variables, and little judgment; and where supervision required was simple, direct and concrete. (Tr. 250).

On May 23, 2007, Dr. Marvin N. Kirk conducted a General Physical Examination on Plaintiff. (Tr. 263-264, 268-274). Regarding Plaintiff's high blood pressure, Dr. Kirk reported that he asked Plaintiff why he had not been to the Free Clinic in Hot Springs to get his blood pressure medicine, and Plaintiff said they kept wanting him to show proof of his income. He stated that since he had not worked in seven years, he did not know how to do that. (Tr. 263). Plaintiff reported that he kept nitroglycerin on himself and that it did give him some relief. (Tr. 263). Dr. Kirk noted that chest x-rays showed Plaintiff's heart appeared normal in size with lungs clear of infiltrates, and that he had mild LVH.[2] (Tr. 265, 276). In the actual General Physical Examination form, Dr. Kirk indicated that Plaintiff's medication was nitroglycerin, and that the range of motion in Plaintiff's spine and extremities were all within normal limits. (Tr. 268, 271). He diagnosed Plaintiff with:

    1.  Hypertension heart disease with LVH

---

[2]The Court believes that this acronym refers to left ventricular hypertrophy.

2. Tension vascular headache
3. Short term memory loss
4. Headache secondary to hypertension

(Tr. 274). Dr. Kirk also found that Plaintiff was moderately limited in his ability to walk, stand,

sit, lift, carry, handle, finger, see, hear and speak, due to shortness of breath "due to uncontrolled

hypertension." (Tr. 274).

On June 18, 2007, a Physical RFC Assessment was completed by non-examining

physician, Steve Owens. (Tr. 277-284). Dr. Owens found that Plaintiff was able to occasionally

lift and/or carry (including upward pulling) 50 pounds; frequently lift and/or carry (including

upward pulling) 25 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours

in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday;

and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as

shown for lift and/or carry. (Tr. 278). No postural, manipulative, visual, communicative, or

environmental limitations were established. (Tr. 279-281). Dr. Owens also found that Plaintiff

had poorly controlled HTN, with symptoms of DOE[3] and chest pain thought to be due to

HCVD.[4] (Tr. 284).

In his Disability Report - Adult, dated February 2, 2007, Plaintiff reported that his chest

pain was so intense most days that he could not function, and that he stopped working on June

30, 2001, because of his condition. (Tr. 106). Plaintiff also reported that he had been prescribed

medicine for his heart and chest pains, but that he could not take them due to his finances. (Tr.

109-110). The only medications he took at that time were Advil for pain and aspirin for his

---

[3] The Court believes that this acronym refers to dyspnea on exertion

[4] The Court believes that this acronym refers to hypertensive cardiovascular disease.

-7-

heart. (Tr. 110).

In his April 12, 2007 report of Pain and Other Symptoms, Plaintiff reported that he had pain in his head and chest that were sharp and persistent, and that hot weather and stress made it worse. (Tr. 113-114). In his Function Report - Adult, dated April 12, 2007, Plaintiff reported that he resided with and took care of his grandson. (Tr. 125). He also stated that his mother, who lived a few blocks away, helped him. (Tr. 126). Plaintiff also reported that he mowed the yard, did cleaning and laundry, prepared sandwiches, and walked to his mother's house on a regular basis. (Tr. 127, 129). He stated that his blood pressure went up when he was bending, squatting, and kneeling, that his eyes hurt and he could not walk far. (Tr. 130). He reported that he could not concentrate on anything very long, did not follow written or spoken instructions well, and could not handle stress or changes. (Tr. 130, 131).

In an undated Disability Report - Appeal, Plaintiff reported that he got tired easily in completing tasks, such as walking, cooking, and cleaning, and that he could not afford medication. (Tr. 155-156).

## III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence

-8-

exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience

-9-

in light of his residual functional capacity (RFC).  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

## IV.    Discussion

## A.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

The ALJ in this case specifically considered the Plaintiff's allegations of severe disabling symptoms in light of the regulations as well as factors to be considered in Polaski. (Tr. 16).  In fact, he addressed each of the Polaski factors, concluding that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 17).  As the ALJ noted, the record reflects that Plaintiff acted as a caregiver for his grandchild, attended to his personal needs and hygiene, prepared light meals, cleaned, did laundry and shopped for his needs.  He also used the computer for two hours at a time, two or three days a week.

-10-

Plaintiff also reported that other than using nitroglycerin on occasion, he only took aspirin and Advil, because he could not afford the medications that had been prescribed for him.[5] However, when Dr. Kirk asked him whey he had not been to the Free Clinic, Plaintiff said because he did not know how to show proof of income. Economic justifications for lack of treatment can be relevant to a disability determination. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992). While it is for the ALJ in the first instance to determine a plaintiff's motivation for failing to follow a prescribed course of treatment, or to seek medical attention, such failure may be excused by a claimant's lack of funds. Jackson v. Bowen, 866 F. 2d 274, 275 (8th Cir. 1989); Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984). However, the Court does not find Plaintiff's excuse for failing to obtain treatment from the Free Clinic to be credible. The Plaintiff testified that his sister worked at a hospital, and also helped him with his grandson. No reason has been given to indicate that Plaintiff's sister or mother would not be able to assist him in obtaining the appropriate assistance at the Free Clinic. In addition, the record reflects that Plaintiff was able to afford to smoke ½ pack of cigarettes per day, and the ALJ is allowed to consider Plaintiff's failure to stop smoking when making his credibility determination. See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

Based upon the evidence in this case, the Court believes there is substantial evidence to support the ALJ's credibility findings.

**B. RFC Assessment:**

The Court next turns to the ALJ's assessment of Plaintiff's RFC. RFC is the most a

---

[5]Plaintiff's Disability Report dated February 2, 2007 indicated that Plaintiff was prescribed HCTZ and Metrolingual in 2004 for his heart and for chest pains, but he reported he could not afford the medications. (Tr. 108-109).

person can do despite that person's limitations.  20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  Guilliams, 393 F.3d at 801;  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).   Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

The ALJ found Plaintiff retained the RFC to perform sedentary work with limitations. He considered the results of tests performed by Dr. Frais, the general physical examination performed by Dr. Kirk, the consultative mental examination of Dr. Spellmann, and gave great weight to the opinions of the state's consultative experts in making this RFC assessment. Although Plaintiff maintained uncontrolled essential hypertension, the cardiac stress test administrated by Dr. Frais revealed good exercise tolerance, appropriate heart rate response with hypertension, and no significant chest pain.  Chest x-rays revealed no acute cardiopulmonary disease.  Plaintiff's heart appeared normal in size on May 23, 2007, and Dr. Kirk found Plaintiff's range of motion in his spine and extremities were all within normal limits.  Dr. Owens, a non-examining physician, found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations, and that Plaintiff was capable of medium work.

-12-

There are no medical records which indicate that Plaintiff was unable to perform sedentary work with certain limitations, as found in the ALJ's RFC assessment.

The Court finds there is substantial evidence in the record to support the ALJ's RFC assessment.

### C.    Hypothetical Question Posed to the VE:

The ALJ posed four hypothetical questions to the VE at the hearing.  The first two questions involved light, unskilled work.  The third question required the VE to give jobs for unskilled sedentary work.  In response to the third question, the VE stated:

> I would say that based on that, we would be left with unskilled sedentary work.  And some jobs I would recommend, based on that hypothetical, again would be factory work and assembly.  At the unskilled sedentary level in Arkansas, there are approximately 1200 jobs.  U.S. and national economy approximately 160,000.  I would also recommend unskilled sedentary - - inspector work, also factory jobs doing inspection work.  At the sedentary level, unskilled in Arkansas there are approximately 1,000 jobs.  U.S. and national economy approximately 42,000.

(Tr. 43).  Plaintiff's attorney asked the VE further questions as follows:

> Atty: Yes, Ms. Clem, on hypothetical number three, if we could remember that, you had said that factory assembly, or factory inspector even though the person could only stand 20 to 25 minutes, sit two hours at a time, I supposed.  How are those jobs performed?  Are they not – are they allowed to alternate sitting and standing like that?

> VE:  I guess it was my understanding, and correct me if I'm wrong, but they were done at the sedentary level, from my understanding for hypothetical three, they could sit two hours continuously before they needed a break, and then go back to sit another two hours continuously.

> ALJ: Yes, that's correct.

> VE: Did I assume that right?

> Atty: That was my assumption.

> VE: Okay.  So –

-13-

Atty: But you're saying those jobs would allow that?

VE: At the sedentary level they would.  You're sitting two hours, you're going to get a break about that time and sitting another two hours.  You're going to get a lunch break, go back for two hours.  Get your afternoon break and then – the numbers I gave were at the sedentary level, not the light level.

Atty: At this time I also wanted to ask jobs of the unskilled or very poorly variety, my experience most VE's tell us they are – employers are less tolerant of missed days of work.  What kind of tolerance of absences would a typical employer in these situations give from your experience?

VE: I would say, especially with this being factory work, no more than one day per month.  In the probationary period it very well could be one to two days every other month.  The tolerance would be less in these jobs.

Atty: Right.  So if there was a limitation due to missing because of pain or whatever, it couldn't be over about a day a month or maybe even less than that?

VE: Yes, correct.

Atty: Okay.  That's all I have.

(Tr. 44-45).

Plaintiff argues that the VE did not give a specific job code number when referencing the jobs Plaintiff could perform, and that "it would appear most of these jobs [factory jobs doing inspection work] are performed at the light work level and not the restricted range of sedentary work in Defendant's argument."  (Doc. 12 at p. 3).  "The reference book itself warns, in its introduction, that the job characteristics for each position 'reflect [] jobs as they have been found to occur, but ... may not coincide in every respect with the content of jobs as performed in particular establishments or at ceratin localities."  Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995)("Because the vocational expert specifically limited his opinion to reflect sedentary work only (requiring lifting of up to 10 pounds occasionally), his testimony was a perfectly acceptable basis for the administrative law judge's conclusions.").  In this case, the VE specifically declared

-14-

that the particular numbers of jobs she was referencing were at the unskilled sedentary level in Arkansas. (Tr. 44). In addition, Plaintiff's attorney asked the VE additional questions, wherein the VE further stated that she was referencing sedentary work. Her testimony was therefore an acceptable basis for the ALJ's conclusions. Id. Furthermore, the absence of specific DOT code numbers does not undermine the substantial evidence supporting the ALJ's decision. "The DOT is a reference source available to vocational experts, but it is certainly not the only one." Patterson v. Commissioner of Social Security, No. 1:09-cf-413 , 2010 WL 774678 at *3 (W.D. Mich. Mar. 1, 2010). Although it would have been preferable for the ALJ to have asked if the VE's testimony was consistent with the DOT, and to specify which DOT codes upon which the VE was relying, failure to do so in this case was harmless error, since any inconsistencies were clarified by the VE.

The Court believes the hypotheticals the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). The Court further believes that the VE's responses to these hypothetical questions constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing unskilled, sedentary work as a factory assembler or inspector. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

**V.     Conclusion:**

Accordingly, the Court recommends affirming the ALJ's decision and dismissing

-15-

Plaintiff's case with prejudice.

DATED this 7th day of February, 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-16-